**Clemmon D. WATERS, Petitioner-Appellant,**

**v.**

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent-Appellee.**

**No. 27884.**

United States Court of Appeals, Fifth Circuit.

March 26, 1970.

Clemmon D. Waters, pro se.

Howard M. Fender, Asst. Atty. Gen. of Texas, Austin, Tex., Crawford C. Martin, Atty. Gen. of Texas, Nola White, First Asst. Atty. Gen., Hawthorne Phillips, Executive Asst. Atty. Gen., Robert C. Flowers, Asst. Atty. Gen., Austin, Tex., for appellee.

Before RIVES, GOLDBERG and GODBOLD, Circuit Judges.

RIVES, Circuit Judge:

On November 20, 1957 Waters was convicted in a Texas State Court of murder with malice and was sentenced to thirty years in the State Penitentiary. He entered upon the service of his sentence without appealing. After serving more than five years he was paroled, and remained out of custody for slightly more than a year and a half when his parole was revoked and he was returned to the penitentiary on February 23, 1965. Thereafter, and thus more than seven years after his conviction, Waters filed his first petition for habeas corpus which was denied without written opinion on May 23, 1966 by the Texas Court of Criminal Appeals. Within a month, on June 17, 1966, Waters filed in the United States District Court for the Western District of Texas his application for habeas corpus. On March 6, 1967 that court conducted an evidentiary hearing at which testimony was given by Waters, Mr. F. B. Kimble, who had been his attorney at his trial in the state court, and Honorable Clarence Ferguson, the state trial judge. On March 23, 1967 the federal district court entered a brief order denying the petition for habeas corpus, but without making findings of fact or conclusions of law. Upon appeal this Court, on March 28, 1968, vacated the judgment and remanded the case for dismissal without prejudice to Waters to reapply in the Texas court in which he was originally tried and convicted. Waters v. Beto, 392 F.2d 74 (5 Cir.).

On June 6, 1968, Waters filed in the state court another petition for habeas in which he alleged, as he had previously done, that he had been denied his constitutional right to a fair trial and due process because the State had suppressed a confession of its only eye witness to the murder, or was guilty of deleting from the contents of her statement and of encouraging its witness to perjure herself contrary to the principle established in Alcorta v. Texas, 1957, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9, Napue v. Illinois, 1959, 360 U.S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217, and Powell v. Wiman, 5 Cir. 1961, 287 F.2d 275.

The state court appointed counsel to represent Waters and, on August 1, 1968, conducted an evidentiary hearing at which it admitted all of the evidence offered in support of the petition, which included only Waters' own testimony and especially certain exhibits hereafter described and the testimony of one Charles Jones repeating evidence favorable to Waters, which he had given upon both of the trials,[1] to the effect that on the night that Waters' wife was killed, Waters and the witness Margaret Marie Smith came to his home, that Margaret had a knife in her hand which she laid on a table and that she then telephoned her mother and told her "I killed Pearlie," referring to Waters' wife. There was no contention that any of Charles Jones' testimony had ever been suppressed.

The only testimony offered by the respondent was the record of the testimony of Mr. F. B. Kimble and of Waters himself theretofore, on March 6, 1967, given before the United States District Court for the Western District of Texas.

The issue presented by the pleadings and evidence centers around two exhibits, A and B, to Waters' testimony. Exhibit A was an original signed "Voluntary Statement of Margaret Marie Smith" which had been marked filed February 1, 1958 and introduced as Exhibit No. 1 of the State of Texas in the trial of Margaret Marie Smith for murder without malice. A portion of that statement had been deleted or "X'ed" out so as to be almost completely illegible to us, but which deletions Mr. Bradley, Waters' court-appointed counsel, was permitted to "read for the purpose of the record" and is apparently conceded to be: "I had gotten my knife to protect myself and went to cutting Pearlie Mae Waters—and went to cutting Pearlie Mae with it."

---

1. His first trial for murder had ended in a mistrial.

Thus, the most pertinent part of Exhibit A, with the deleted or X'ed out words now emphasized, reads as follows:

"I came from my home in Oklahoma City, Oklahoma, on December 21, 1956, to spent [sic] Christmas with my mother, Beatrice Livingston, at Mexia, Texas. I have known Clemmon D. Waters all my life, and he and I started to having sexual intercourse with each other about six or seven years ago *our relations with each other beginning about the year 1949.* I married my present husband about 4 years ago, and we separated and then went back together about six month ago.

"I also have known Pearlie Mae Waters practically all my life, she being *the wife of Clemmon D. Waters.* I have just lived at Oklahoma City the past six months and prior to that time lived the remainder of life at Mexia, Texas.

"Last night about 10 or 11 o'clock Clemmon D. Waters and I went to Eddie Calhoun's place, called 'My Place' located on Belknap Street in Mexia. While we were there Pearlie Mae Waters came in and found us together and started a disturbance and Policeman J. B. Miller arrested Pearlie Mae and took her to the Police Station. About 15 minutes after Pearlie Mae Waters was taken to the Police Station in Mexia, Clemmon D. Waters said he was going home and for me to come by there. I stayed at Calhoun's place about 30 minutes and then went down to Clemmon D. Waters place like he had told me.

"I had been in the house about five minutes when Pearlie Mae Waters came in. The door was locked and Pearlie Mae Waters broke out the windows and kicked the door in and came into the house which was not lighted and Pearlie Mae Waters jumped on me in the dark and we went to fighting. Clemmon was also mixed up in the fight. *I had gotten my knife to protect myself and went to cutting Pearlie Mae Waters—and went to cutting Pearlie Mae with it.* After the fight I ran out of the house and went to a telephone and called for an ambulance, and while I was at the telephone Clemmon came to where I was and brought me the knife and laid it down beside my purse. I do not know whether I had the knife during the fight or whether Clemmon had it, but I do know he brought the knife to me after the fight.

"My mother had come, as I had phoned her, and she tried to get Clemmon D. Waters to stay there until the officers came but he would not stay and immediately left. Clemmon D. Waters was right in the middle of the fight from the time it started until it ended, and brought me the knife after the fight was over. I believe that Pearlie Mae Waters must have had a knife as I got cut on my hand during the fight."

The corresponding part of Exhibit B is word for word the same except that the deleted or X'ed out words are entirely omitted with no indication that anything has been deleted or X'ed out. Exhibit A purports to be a facsimile copy of a statement signed by Margaret Marie Smith and witnessed by Owen F. Watkins and Jack Bothwell, and some shadowy but illegible indication on the facsimile copy of the possible signature of a third witness. Exhibit B purports to be a facsimile copy of a statement dated on the same day as Exhibit A, "the 29th day of December A.D. 1956." However, Exhibit B bears only the *typed* name "/s/ Margaret Marie Smith," instead of her handwritten signature, and Exhibit B has typed the name of only one witness, Owen F. Watkins.

Mr. Kimble, the attorney who represented Waters when he was tried and convicted, testified in the first federal habeas hearing on March 6, 1967 that he found the original of Exhibit B in his file and turned it over to Mr. Pakis, the court-appointed attorney who then represented Waters on his habeas hearing. Exhibit A, as has been stated, is a facsimile of a statement first introduced in

evidence on February 1, 1958 in the trial of Margaret Marie Smith for murder without malice. At the time of Waters' criminal trial, according to Mr. Kimble's testimony, the prosecuting attorney had furnished him Exhibit B but he had no information that anything had been deleted or X'ed out of that statement, or that it had ever contained the deleted or X'ed out passage: "I had gotten my knife to protect myself and went to cutting Pearlie Mae Waters—and went to cutting Pearlie Mae with it." The question is whether by withholding that information the State prosecuting attorney concealed evidence from Waters and his attorney which tainted his trial with such fundamental unfairness as to amount to a denial of due process of law.

The question is colored by other facts and circumstances. Waters could not read and write; he was totally illiterate. His attorney had failing eyesight when Waters was tried and convicted on November 20, 1957, and was blind on March 6, 1967 when he testified on Waters' first federal habeas hearing. While Waters was sentenced to thirty years imprisonment upon his conviction in November 1957, when Margaret Marie Smith was tried a couple of months later, on February 1, 1958 (according to Waters' testimony which was not disputed on this point), "they gave her five years probation." At the close of the petitioner's case on the first federal habeas hearing on March 6, 1967, Waters' then attorney, Mr. Pakis, made the following statement:

"Your Honor, I would like to say that we have made an attempt to get the original statement of facts on this case, original testimony, and it was only very recently that it was found at all, and we could not have it ready before this hearing. If the Court deems it advisable, we could—I could, I presume, get it reproduced, with some difficulty, and have it as a part of your consideration. I think the petitioner's case is concluded."

So far as appears, the original testimony in the trial when Waters was tried and convicted has not been reproduced, certainly it has not been offered in evidence in any of the habeas hearings. That is true notwithstanding the suggestion of this Court for a further development of the facts:

"We also think that an additional hearing of the cause will be necessary in order to permit a further development of the facts. Counsel on appeal has uncovered the actual statement signed by Miss Smith, which he says will shed more light on the case than did the conformed copy in the hands of the lawyer who represented Waters at the hearing in the court below. The state trial court should exercise its inherent power to compel production of the statement and should study it in light of the woman's testimony at the trial which resulted in appellant's conviction. Also, there should be additional testimony on the question of how much Waters and his lawyer knew about the statement at the time of trial so that the legal effect of their knowledge can be properly assayed." 392 F.2d at 76.

Margaret Marie Smith testified against Waters at both of his criminal trials, when a mistrial was declared and when he was convicted. Just what her testimony was does not appear, other than from Waters' testimony in the first federal habeas hearing:

"Q. Was Margaret Smith in the trial questioned in regard to her participation in the murder, whether or not she did it?

"A. Well, no. She was up there. She was the first one on the stand. She was the first one they put up there.

"Q. Uh, huh.

"A. Here is what Margaret told: She say, 'He gave the knife to me.' She didn't say whether I gave the knife to her before or after the murder, because she never was questioned. And Mr. Kimble told her, said, 'Now, you know that you killed Pearlie May Waters, his wife,' and

she went to crying, and so he didn't get a chance to ask her no more questions, because the D. A. removed her from the seat up there, so he didn't get a chance to question her any more after she went to crying up there.

"Q. So, she didn't testify that she did or that she didn't commit the murder; is that right?

"A. No, sir, she didn't testify that she did or that she didn't."

Mr. Kimble's recollection of the testimony had become hazy. He testified in part:

"I don't remember the testimony. My notes were taken in my own handwriting. I had some vision, but my wife tried to help me decipher it, but it was half shorthand and half like that, but there was one pertinent statement there that I do remember, that when Clemmy and Margaret went over across the street to Charlie Jones' house, that Mrs. Jones was there, and that Margaret had the knife, and handed it to her, and she said, 'I have cut Pearly May, and I have cut her mighty bad.' I remember that. That is as far as I can do that. As to these details and time and things like that, frankly, I don't recall, but I think that—I think Clemmy has served enough time down there. I don't think he participated in that. I still have my doubts that he was an accomplice, even though he was there. I have thought it many times, that his statements were true, that what he was trying to do was separate them. If I remember correctly, at the trial Clemmy told me that he had been stabbed in the hip back here somewhere, and I had our sheriff go out in the corridor somewhere, and have him take his trousers down and I think I proved that, and which, to me, it was very evident that he was standing there between them, and Margaret was behind him, and in making a gouge at his wife, she got him in that hip."

The only witnesses who have testified on any of the habeas hearings are Waters, himself; Mr. Kimble, his attorney; Judge Clarence Ferguson, the state trial judge; and Charles Jones, the witness to whose house Waters and Margaret Marie Smith went after the killing. It does not appear whether any other witness was alive and available to either party. The witnesses to the statement of Margaret Marie Smith are not accounted for, nor is she. It may well be that a remand for further development of the facts would be fruitless, though it does appear that a transcript of the testimony of Margaret Marie Smith and of Waters himself at the trial when he was convicted might be helpful in showing the importance vel non of the deletion or X'ing out from Margaret Marie Smith's statement, Exhibit A, of the passage: "I had gotten my knife to protect myself and went to cutting Pearlie Mae Waters —and went to cutting Pearlie Mae with it."

The circumstances under which that passage was deleted or X'ed out have never been disclosed. Waters himself testified:

"Q There was nothing X'ed out on what she signed?

"A. No sir."

That was the only testimony, in addition to the physical appearance of Exhibit A, from which it could be found on any of the habeas hearings that the deleted or X'ed out statement was a part of Margaret Marie Smith's original written statement. The body of the statement in both Exhibit A and in Exhibit B is typed. Whether typed directly as Margaret Marie Smith spoke or typed according to the recollection of the interviewer or otherwise does not appear.

In the last state habeas proceeding, Judge Ferguson, the state judge, made extensive findings of fact including the following:

"5. Petitioner together with one Margaret Smith were [sic] in a house occupied by petitioner and his wife,

Pearlie Mae Waters, the deceased, at the time of the killing. Margaret Marie Smith made a statement, which was reduced to writing, to the County Attorney shortly after her arrest. A copy of such statement was given to petitioner's counsel prior to the trial of petitioner. Margaret Marie Smith testified at both trials of petitioner and was questioned extensively by defense counsel about her participation in the alleged offense. Said statement, made a part of the transcript herein, was not tendered or offered in either trial by defense or state.

"6. I find that there is no evidence that the prosecution withheld any evidence vital to defendant's defense.

"7. I find no evidence that the prosecuting officers had any knowledge that Margaret Marie Smith committed perjury nor that they aided, abetted and encouraged her to do so.

"8. I find no evidence that the testimony of Margaret Marie Smith was inconsistent with her 'confession or statement.'

"9. I find no competent evidence that the prosecuting officers altered or deleted the contents of the confession after the same was signed by Margaret Marie Smith nor do I find any evidence that 'the prosecuting officers went back into the confession of their purjurious [sic] star witness with a typewriter and exed through the very vital part of the confession.'"

On the federal habeas hearing from which the present appeal is prosecuted, the United States District Judge referred to the findings and conclusions of the State court and stated:

"The judge of the convicting court found 'no evidence that the prosecution withheld any evidence vital to' the defense and 'no evidence that the prosecuting officers had any knowledge that Margaret Smith committed perjury nor that they aided, abetted and encouraged her to do so.' (See exhibit attached to Respondent's answer.) The record as a whole reveals petitioner to be without merit on this point."

■■■ The record is left in a most unsatisfactory state. Many questions are left unanswered.[2] Perhaps they cannot be answered, but that has not been shown. If the deleted or X'ed out passage was truly a part of Margaret Marie Smith's original statement, either as made orally or as originally written; if that passage was critical or important to Waters' defense; and if it was in fact

2. Such as: (1) The substance of the testimony of Margaret Marie Smith and of Waters at the time of his trial and conviction. It seems probable that this much can be supplied. (2) When and under what circumstances did the X'ed out or deleted statement, Exhibit A, come to the knowledge or attention of Waters or his attorney. It now appears only that it was introduced on the trial of Margart Marie Smith about two months after Waters had been tried and convicted. (3) Are any of the witnesses to Margaret Marie Smith's statement, Exhibit A, still available, or is she still available. If so, testimony may be produced as to the circumstances under which her statement, Exhibit A, was given and under which a part of it was deleted or X'ed out, and a rational conclusion may be reached as to whether Margaret Marie Smith did in fact, either orally or in writing, make that part of the statement which has been deleted or X'ed out. (4) The ultimate question to be deduced from all of the available facts and circumstances as to whether the prosecution concealed or suppressed a part of the statement of Margaret Marie Smith material to Waters' defense, or which could have been used to impeach the witness' credibility (or the names of any of the witnesses to that statement) in violation of the principle established in Alcorta v. Texas, 1957, 355 U.S. 28, 78 S.Ct. 703, 2 L.Ed.2d 9; Napue v. Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, and Powell v. Wiman, 5 Cir. 1961, 287 F.2d 275. In resolving that question, it should be kept in mind that "Our concern is with the effect of those errors, whether well-intentioned or not, on the constitutionally protected right of a criminal defendant to a fair and impartial trial." Burgett v. Texas, 1967, 389 U.S. 109, 116, 117, 88 S.Ct. 258, 19 L.Ed.2d 319 (concurring opinion of Chief Justice Warren).

concealed by the prosecution from Waters and his counsel until after his trial and conviction; then we think the judgment of conviction should be vacated. Concealment or suppression could consist of deleting something which Margaret Marie Smith said, or of the prosecutor's furnishing what purported to be a true and correct copy of a statement in his file but which was not true and correct because it varied either by difference in subject matter or by failing to reveal a material deletion contained in the copy in his file. The question is a close one, remembering that the burden of proof rested upon Waters to prove the invalidity of the judgment. We are reluctant, however, to rule upon that question on such an unsatisfactory record. Instead, we hold simply that the district court did not adequately comply with the exacting duty imposed by Townsend v. Sain, 1963, 372 U.S. 293, 316, 318, 83 S.Ct. 745, 9 L.Ed.2d 770, and 28 U.S.C.A. § 2254, to carefully scrutinize the state-court record and to require adequate development of all of the material facts and circumstances. The judgment is therefore vacated and the case remanded for further proceedings consistent with this opinion.

Vacated and remanded.